SCALES *v.* THE UNION CENTRAL LIFE INSURANCE COMPANY.

4-5991                                              141 S. W. 2d 547

Opinion delivered June 10, 1940.

*Elmer G. Schoggen* and *Melbourne M. Martin,* for appellant.

*Buzbee, Harrison, Buzbee & Wright,* for appellee.

MEHAFFY, J. This action was instituted in the Pulaski circuit court by the appellants, W. T. and Ivy E. Scales, against the appellee, The Union Central Life Insurance Company on April 12, 1939. The complaint alleged that on August 11, 1926, the appellee, The Union Central Life Insurance Company, delivered its policy of insurance on the life of Mrs. Ada S. Scales, mother of appellants, by the terms of which policy the appellee agreed to pay to the plaintiffs, as beneficiaries thereunder, the sum of $5,000 upon the death of the assured. It was alleged that all the terms and conditions of said policy were complied with, and that the same was in full force and effect at the time of the death of the assured, and that there is now due and payable on said policy, after the deduction of a loan made by the insured, the sum of $3,000.

On January 10, 1940, appellants filed an amendment to the complaint, and they replied to the answer of appellee. The suit was originally brought by W. T. Scales, and his brother, Ivy E. Scales, was made a party plaintiff.

The appellee, on May 11, 1939, filed an answer making specific and general denial of each and every allegation in the complaint. It denied that the policy was in

legal force and effect, and stated further that the policy was voluntarily surrendered on or about October 14, 1938, by the insured during her life and upon a payment by appellee to the insured of the cash surrender value at that time.

The reply to the answer denied that the insured, Ada S. Scales, voluntarily surrendered during her lifetime the policy sued on, and alleged that she was overreached by representation that said policy had no future value, in that the premium due August 11th was not paid, except that of an accumulative dividend, when in fact said policy, by its provisions, automatically carried itself to a date appreciably beyond the date of insured's death. Appellants further denied that insured received the cash surrender value of the policy; that pursuant to a contract for a valuable consideration between appellant and the insured and the appellee, appellants for a long period of time paid all the premiums on the said policy of insurance, and they, therefore, acquired a vested interest and became the owners of the proceeds of said policy on the death of the insured; that the appellee insurance company had, for a long period of time, depended on the appellant, W. T. Scales, for the payment of the premiums due, and that pursuant to an agreement with their mother, the insured, a vested interest was given them and that Ivy E. Scales, brother of W. T. Scales, acted through him as his agent; they further alleged that the insured, Ada S. Scales, was incapable of making a valid and binding contract with the appellee, to the exclusion of appellants without their knowledge and consent because of their vested rights in the policy. It is further alleged that, at the time said policy is alleged to have been surrendered and canceled, the company already had it in its possession and was holding the same as security for a loan, and that neither of the appellants had any notice of the attempted surrender or cancellation of the policy. They further alleged that under the provisions of said policy, failure to pay the premium alleged to be due on August 11, 1938,

did not void said policy but under the provisions of the same, it became automatically transformed into extended term insurance for such period of time as the reserves in cash against said policy would afford and that the said reserves carried the same on an extended insurance basis appreciably beyond the date of the death of insured; that by reason of their vested interest in said policy, their failure of knowledge or consent to the alleged surrender and cancellation, the terms of the contract itself and the cash reserves against the said policy, the appellee breached the said contract and that the same was in full force and effect at the time of the death of the insured.

At the close of the evidence each party requested a directed verdict, and the court directed a verdict for the appellee. Motion for new trial was filed and overruled, and the case is here on appeal.

W. T. Scales testified in substance that he is one of the plaintiffs, and the other is his brother, Ivy E. Scales; their mother was Ada S. Scales; she had the insurance policy in question; there were no other children, just the two brothers. The policy sued on was introduced in evidence, and was for the sum of $5,000, and the beneficiaries named, W. T. and Ivy E. Scales, in the portion of 3/5 and 2/5 respectively. Witness states the change in beneficiary was made in the early part of February, 1938, and the mother's death occurred October 23, 1938; witness was in Houston, Texas, at the time; he loaned his mother money to pay the premiums from time to time. The attorney for appellant then asked if witness had any understanding with his mother about the payment of these premiums and if so to state what it was. Objection was made and sustained and exceptions saved. Witness stated that he began regularly in the latter part of 1937 to pay the premiums on the policy. Drafts paid by witness were introduced. Letter from the insurance company to Mrs. Ada Scales was introduced. The letter is as follows:

"The Union Central Life Insurance Company
J. J. Harrison, Manager
414-419 Donaghey Building
Telephone 8271-8272 ·

"Little Rock, Ark.,
June 20, 1938.

"Mrs. Ada Scales,
Weldon, Arkansas.
"Re: 899 475

"Dear Mrs. Scales:

"Enclosed herewith you will find copy of statement from the home office of the company on your policy numbered above.

"To keep this policy in force it will be necessary to increase the loan for the full amount and pay in cash $68.55, this will cover the old loan and interest and the balance of the extension agreement given in settlement of the 1937 premium, thus paying everything for another year.

"If you will sign the enclosed loan agreement and health certificate and send them in by return mail with your check for $68.55 proper receipts will be furnished and this policy will be in force without any further pay-. ments for another year.

"Yours truly,

"J. J. Harrison, Manager.

By Vada Cato /s/
vc                    Vada Cato, Cashier."

"P. S.   The last day this settlement will be acceptable is July 1st. 1938."

After the introduction of the letter witness continued: the $68 was paid; when asked what he did upon receipt of the letter from his mother, objection was made to any conversation between him and his mother; objection sustained; a check was introduced, written by Mr. Cole to witness' mother showing that she borrowed $68 indorsed by his mother and the insurance company; witness knew nothing about the attempted surrender and

cancellation of the policy prior to the death of his mother; neither he nor his brother received any information relative to the surrender of the policy prior to her death; after her death he went to the insurance company in connection with the matter and received a copy of the letter that his mother had written; the letter was introduced in evidence and is as follows:

"October 11th, 1938

"Mr. J. J. Harrison,
  Little Rock, Arkansas.
"Dear Sir:

"I have decided to drop my insurance with you. I was in the office a few days ago. Was told I'd have to pay $21.40 (twenty-one dollars & forty cents) now, and pay the regular dues $27.20 beginning Nov. 11th. This I can not well do. So I'm relinquishing the policy. Miss Lewis said I'd have $33.00 coming to me and maybe more she would find out and let me know. I have not heard yet. Please send me what amount is coming to me and oblige—

"Sincerely,

"Mrs. Ada S. Scales.

"Address
. Weldon, Arkansas."

Witness stated that he was paying the draft and had arranged the payment of the $68 because the policy was payable to himself and his brother; letter of October 12th was introduced, which is as follows:

"October 12, 1938.

"Mrs. Ada Scales,
  c/o Miss Leola Hall,
  Weldon, Arkansas.

"Re:   899 475

"Dear Mrs. Scales:

"The Company advises that the cash surrender value of your above policy is $1,813.75, and deduucting from this the present policy loan of $1,740 with interest from April 11, 1938, leaves $38.78 due you. We have check payable to your order for this amount $38.78 and if you

will sign the attached surrender voucher as Ada S. Scales on the line indicated by pencil check marks and return it to us, the check will be promptly forwarded to you.

"Yours very truly,

"J. J. Harrison, Manager.
By Vada Cato /s/
Vada Cato, Cashier."

The check was then introduced showing the payment by the insurance company to Mrs. Ada S. Scales of $38.78. This check was indorsed by the insured and paid by the bank. Memorandum of account was then introduced showing a loan on the policy of $1,740. Witness was then asked if he recalled whether there was an extension agreement made April 11, 1938, and he answered "No"; he said he knew his mother's signature and that was her signature.

Statement was then introduced showing the extension agreement signed by Mrs. Ada S. Scales. This was on April 11, 1938. Insurance company wrote witness about draft drawn on him in Hot Springs and he was addressed at Houston; this letter was written latter part of May and addressed to witness at Hot Springs and forwarded to him at Houston; does not know what he did with the letter; did not make any reply to it, but wrote his mother; amount of draft was $27.20; he did not receive a letter addressed in the envelope of Union Central Life Insurance Company while at Houston; only letter he recalls receiving from his mother was the one dated the 20th asking for $68; his best recollection of the letter is that it stated they had drawn a draft on him that had not been honored and wanted to know what bank to draw on in Houston; he did not reply to the company, but wrote his mother; he has since paid Mr. Cole the $68.

Appellants then asked permission to introduce the agreement between witness and his mother. The court declined to permit the introduction of this testimony, and stated: "There is no showing that the company had any

knowledge of that." Appellants offered to prove by witness that he and his brother, pursuant to that understanding with his mother, paid the premiums by drafts drawn on him by the company. The court ruled that there was no connecting link whereby the company knew of this agreement, and held that any agreement between him and his mother without notice to the company, would not bind the company; attorneys for appellants stated that the company was put on notice by drawing the drafts.

Mr. J. J. Harrison, manager of the life insurance company, was handed a letter, which was introduced in evidence, to Mr. M. M. Martin, advising Mr. Martin that the home office letter transmitting the copy which Mr. Martin had requested, stated:

"I assume you have explained that the insured, on October 14, 1938, executed a voucher for the policy's cash surrender value of $1,780, plus the dividend of $33.75, less the loan of $1,740 and accrued interest of $34.97, the cash surrender value being calculated as of August 11, 1938, and that she indorsed and cashed our check for the net surrender proceeds of $38.78. By these very definite acts, the insured must have known that the policy was terminated by its surrender."

Mr. Harrison states that the insured executed a voucher on October 14, 1938; did not recall any conversation with Mrs. Scales about this particular surrender; she had been in his private office at the time the policy originally lapsed; he did not at any time tell Mrs. Scales that the policy provided for extended time insurance or extended insurance value; assumes that if Mrs. Scales had any familiarity with the contract, she knew it was not optional because it is not optional in sub-standard contract; had seen Mrs. Scales personally a number of times; thinks she had a great deal of confidence in the office; knows that Mrs. Scales had difficulty and made numerous loans, and the conferences he had with Mrs. Scales were with reference to how to maintain the policy and keep it in force; it is the prac-

tice of the insurance company, when loans are made on policy values, the home office requires that the policy be deposited as collateral security, and the policy is in possession of the company when the first loan is made; insurance company had possession of the policy as collateral for the loan made to Mrs. Scales, at all times; Mrs. Scales did not have possession of the policy; witness had knowledge of the arrangements when one of the drafts came back unpaid; he did know that one was unpaid, and the report clerk brought the information to him; is not sure that he made any inquiries; knows that Mrs. Scales had her sons named beneficiaries when the policy came out of the assignment; it was assigned for a considerable period of time and the insurance company's transactions in getting the premium settled was through the manager of the building and loan, and knows that the assignment was released; this was first time he knew the sons were beneficiaries; knew that the mother was deeply concerned in keeping the policy in force for the benefit of her sons; they had been named beneficiaries; the policy had been assigned for a debt to the building and loan and later the assignment was released; witness said they did not think of a beneficiary having any interest in a policy until it is a death claim; the policy is owned by the insured, unless he makes a specific change; that before a policy is settled off company relies upon its own records to ascertain if there are any liens against the policy and states that the surrender voucher gives them pertinent information. The surrender voucher was then introduced. Witness stated that there was no provision for a service charge in the policy. When asked about the 31 days' notice he stated that the matter could be cleared up to the satisfaction of the appellants by the young ladies who waited on Mrs. Scales; that he had no knowledge of it; Mrs. Scales had notice. Attorney then asked if she had 31 days' written notice, and witness said she had had longer than that. Witness then stated that the phraseology in the letter of June 20th "another year" meant a policy year, not a calendar year. Witness was asked if since the settle-

ment Mrs. Scales was entitled to fractional dividend, and assuming that the dividend was $34 between August, 1938, and August, 1939, then would it have an additional value of $5 and some cents, and witness answered that that was not his judgment; he was sure no dividends were paid. There was then introduced a letter from the attorneys for the appellee to Mr. Melbourne Martin advising him that the dividend due and payable would have been $34.30, and stated that they were unable to comply with the additional request that defendant stipulate the cash surrender value paid to Mrs. Scales was sufficient to purchase 96 days' extended insurance for the reason that the policy was sub-standard and did not contain an option for extended insurance; company did not pay Mrs. Scales any fractional dividend accruing between August, 1938, and October, 1938; the extension agreement itself clearly defines it and how the policy is to be kept in force.

Miss Vada Cato testified that she was instructed to tell Mrs. Scales if her policy continued in force she would have to pay that amount of money and use her full loan value to cover the indebtedness, the amount due at that time; she stated that the annual premium was $307 and the monthly premium $27.20; that the $68.55 would not have paid the premium for a full calendar year, but that it would pay until the next anniversary which was August 11th; "another year" did not mean a calendar year.

Miss Varian Lewis testified that she was connected with the insurance company at Little Rock, and introduced a letter that she had written to Mrs. Scales, stating that she thought she was wise in surrendering her policy since the indebtedness exceeded the value, and expressed the wish that there had been something they could have done to help her; the company had possession of the policy and Mrs. Scales had no opportunity to peruse that policy and relied on witness' representations: represented that it had no further value in it; Mrs.

Scales came to the office quite often and witness and Mrs. Scales were very friendly.

Miss Gussie Shoppach testified that she was authorized by Mrs. Scales to draw the draft for the benefit of the company; Mrs. Scales told her that Mr. Scales would pay the monthly premiums and asked her to draw drafts on him, and she did each month; Mrs. Scales again came to the office and authorized her to draw that draft; witness drew the draft handed to her, signed by J. J. Harrison, agent; she told witness to draw monthly drafts; she did not inquire why the company was authorized to draw drafts on W. T. Scales; Mrs. Scales said that W. T. Scales kept the premiums paid by means of drafts; witness said she drew drafts on W. T. Scales to keep the policy alive; she would think that he had an interest in it; she knew about the beneficiaries and about their interest.

W. E. Terry testified that he had been in the insurance business since November, 1916; that he is a qualified actuary; was handed a statement of the computations showing debits and credits, and asked whether the same provided for extended term insurance; he answered that it did; that there were two options for the insured to exercise; one was to use the figure $38.78.

There was considerable evidence, but we have copied substantially all the evidence which throws any light on the questions involved. Counsel for appellants have cited many authorities in support of their contention that the beneficiaries had a vested interest, and that the insured could not surrender the policy without the consent of the beneficiaries. There seems to be some conflict in authorities on this question, but this court holds that if the beneficiaries had a vested interest, and the insurance company had notice of this, the policy cannot be canceled and surrendered without the consent of the beneficiaries.

This court said in the case of *Illinois Bankers' Life Association* v. *Rhodes,* 147 Ark. 191, 227 S. W. 403: ''The policy, in express terms, gave the assured the right to

change the beneficiary at will, and for that reason appellee as the specified beneficiary had no vested right or interest in the policy limiting the right of the assured to surrender or abondon it, even if it had been finally accepted. . . . We are of the opinion that the assured completely abandoned his policy and for a consideration canceled his obligation for the premium note and with it the policy itself, and that there was no liability, even though the company had received from its own agent the portion of the premium to which it was entitled under the contract of the agent.''

''In the absence of a provision reserving to the insured the right to surrender the policy, the beneficiary acquires a present vested right upon its issue which cannot be taken away without his consent. But this policy reserved the right to the insured to surrender it after completion of payment of premiums for the first two policy years and to receive the surrender value in cash at any time during the grace period; and further to receive any benefit, enjoy any privilege, or exert any right conferred by its terms, without the consent of the beneficiary. Payment of premiums for the first two policy years had long since been completed; the premium due in 1932 was unpaid; and the surrender was effected during the grace period. The beneficiary acquired a mere expectancy which could be extinguished by the surrender of the policy in the manner and within the time authorized by its terms.'' *Nielson* v. *General Amer. Life Ins. Co.,* 89 Fed. 2d 90, 110 A. L. R. 1133.

Counsel for appellants cite the case of *Reilly* v. *Henry,* 187 Ark. 420, 60 S. W. 2d 1023. In that case the insurance company was not involved. It was a suit between the original beneficiary who had paid the premiums and a substituted beneficiary who had not paid anything. The court in that case said, ''The rule is well established that where the policy provides for a change of beneficiary by the insured, the beneficiary first named has no vested interest as in ordinary policies, but this rule is not absolute and indefeasible, as contended by the appellees. Circumstances may arise,

either in the procurement or during the life of the policy, such as would establish an equitable interest in the proceeds thereof. There are many cases which recognize this exception to the rule, and we have found none to deny it where the contest for the proceeds is between rival claimants and which do not involve the rights of the insurer arising out of the contract as written.''

Counsel for appellants call attention to Couch on Insurance, vol. 2, pp. 990, 991. In that same volume, p. 989, it is said: ''If the beneficiary named in a life policy has no vested interest, but, because of a reservation of right to change the same, has merely an expectancy, the insured may cut off his rights by surrendering the policy for cancellation. So, an insured who has reserved the right to change the beneficiary of a policy on his life can, on maturity or thereafter, take the cash surrender value without the consent of the beneficiary.''

If the benficiaries had a vested interest and the insurance company had knowledge of it, it could not cancel the policy without the consent of the beneficiaries. Whether the beneficiaries had a vested interest, and whether the company had knowledge of it, were, under the evidence in this case, questions for the jury.

We think, there was sufficient evidence to submit these questions, but the parties did not submit them to the jury. Each of the parties requested the court to direct a verdict in its favor, and this court has repeatedly held that where each of the parties requests a peremptory instruction in his favor, and requests no other instructions, they, in effect, agree that the issue should be decided by the court, and the court's finding has the same effect as the verdict of a jury. *St. Louis, I. M. & So. Ry. Co.* v. *McMillan,* 105 Ark. 25, 150 S. W. 112; *Home Fire Ins. Co.* v. *Wilson,* 109 Ark. 324, 159 S. W. 1113; *Gee* v. *Hatley,* 114 Ark. 376, 170 S. W. 72; *Ozark Diamond Mines Corp.* v. *Townes & Garanflo,* 117 Ark. 552, 174 S. W. 151; *Watkins* v. *La. State Life Ins. Co.,* 151 Ark. 596, 237 S. W. 89; *Marion Machine, Foundry & Supply Co.* v. *Fed. Oil Marketing Corp.,* 188 Ark. 652, 67 S. W. 2d 598.

This court, in the case of *Manhattan Const. Co.* v. *Atkisson*, 191 Ark. 920, 88 S. W. 2d 819, quoted from *Barlow* v. *Foster*, 149 Wis. 613, 136 N. W. 822, as follows: "We must also keep in significant view the rule that the verdict of a jury cannot properly be disturbed on appeal merely because of its appearing to be against the clear weight of the evidence, or because, if we were to pass upon the matter as seen in the printed record, we might find differently than the jury did.

"If the verdict has any credible evidence to support it—any which the jury could in reason have believed, leaving all mere conflicting evidence, evidence short of matter of common knowledge, conceded or unquestionably established facts and physical situations—it is proof against attack on appeal, and that must be applied so strictly, on account of the superior advantages of court and jury for weighing the evidence, that the judgment of the latter approved by the former is due to prevail, unless it appears so radically wrong as to have no reasonable probabilities in its favor after giving legitimate effect to the presumption in its favor and the makeweights reasonably presumed to have been rightly afforded below which do not appear, and could not be made to appear, of record." *Baldwin* v. *Wingfield*, 191 Ark. 129, 85 S. W. 2d 689.

In the Manhattan Const. Co. case, *supra,* we also quoted as follows: "Under our system of jurisprudence, it is the province of the jury to pass upon the facts. It is not only their privilege, but their right, to judge of the sufficiency of the evidence introduced, to establish any one or more facts in the case on trial. The credibility of the witnesses, the strength of their testimony, its tendency, and the proper weight to be given it, are matters peculiarly within their province. The law has constituted them the proper tribunal for the determination of such questions. To take from them this right is but usurping a power not given." *Cunningham* v. *Union Pac. Ry. Co.*, 4 Utah 206, 7 P. 795; *Equitable Life Assurance Society* v. *Felton*, 189 Ark. 318, 71 S. W. 2d 1049; *Healy & Roth* v. *Balmat*, 189 Ark. 442, 74 S. W. 2d 242; *Brown* v. *Dugan*, 189 Ark. 551, 74 S. W. 2d 640;

*Chicago, R. I. & P. Ry. Co.* v. *Britt,* 189 Ark. 571, 74 S. W. 2d 398.

While some courts hold that the beneficiary has a vested interest, this court is committed to the doctrine that he does not have a vested interest merely because he is beneficiary; but that it may be shown by evidence that he has a vested interest, and when so shown, if the evidence also shows that the insurance company had notice of it, it will be liable to the beneficiary; and it need not be shown by direct evidence, but may be shown by circumstantial evidence, as was introduced in this case. We think there was sufficient evidence that if the verdict had been for appellants, this court would have been bound under the rule adopted to affirm the verdict.

Since the finding of the court has the same effect as the finding of a jury, its finding will not be set aside although we may believe that the verdict is against a preponderance of the evidence.

The judgment is affirmed.